## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EMMA CHEMICALS CO., INC., individually and on behalf of all those similarly situated, <br><br>   Plaintiff, <br><br> v. <br><br> BASF SE, BASF CORP., BAYER AG, BAYER CORP., BAYER MATERIALSCIENCE LLC, COVESTRO LLC, DOW CHEMICAL CO., HUNTSMAN INTERNATIONAL LLC, HUNTSMAN CORP., MITSUI CHEMICALS AMERICA, INC., MITSUI CHEMICALS, INC., MITSUI CHEMICALS & SKC POLYURETHANES, INC., MCNS POLYURETHANES USA INC., WANHUA CHEMICAL (AMERICA) CO. LTD., WANHUA CHEMICAL GROUP CO., LTD., <br><br>   Defendants. | Civil Action No. <br><br><br> **CLASS ACTION COMPLAINT** <br><br><br>    **JURY TRIAL DEMANDED** |

Plaintiff Emma Chemicals Co., Inc. ("Plaintiff") files this civil action pursuant to Section 1 of the Sherman Act, Section 4 of the Clayton Act, and Rule 23 of the Federal Rules of Civil Procedure, for damages, costs of suit, injunctive relief and other relief as may be just and proper, on behalf of itself and classes of those similarly situated ("Class" as defined below) against defendants BASF SE, BASF Corp., Bayer AG, Bayer Corp., Bayer MaterialScience LLC, Covestro LLC, Dow Chemical Co., Huntsman International LLC, Huntsman Corp., Mitsui Chemicals America, Inc., Mitsui Chemicals, Inc., Mitsui Chemicals & SKC Polyurethanes, Inc., MCNS Polyurethanes USA Inc., Wanhua Chemical (America) Co. Ltd., Wanhua Chemical Group Co., Ltd., for their conspiracy to violate federal antitrust laws by fixing, raising and/or maintaining the prices of methylene diphenyl diisocyanate ("MDI") and toluene diisocyanate ("TDI") in the United States.

Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges as follows.

1.      From at least January 1, 2016 to the present, Defendants and certain unnamed co-conspirators conspired to fix, raise, maintain, or stabilize the prices of MDI and TDI.

2.      In the years immediately preceding Defendants' conspiracy, prices for MDI and TDI in the United States and across the globe were relatively stable. As noted by the Independent Chemical Information Service ("ICIS") in September of 2013, MDI prices in the United States were "steady, amid balanced supply and demand." In 2015, prices declined due to lower costs of raw materials, such as benzene and oil.

3.      In 2014, Defendants were experiencing reduced profits in MDI and TDI products caused by a "market oversupply" (*i.e.*, availability exceeded customer demand). To stabilize profits and increase their margins, Defendants conspired to fix, raise, stabilize and maintain MDI

and TDI prices by: (a) engaging in coordinated limitations on the production of these products; and (b) engaging in a series of lockstep price increases for these products.

4.     Defendants collectively carried out their plan to reverse the oversupply in the MDI and TDI markets by permanently closing and/or temporarily suspending operations of certain MDI and TDI manufacturing plants located around the world, as well as operating plants at reduced capacity. Prior to the conspiracy, plant-related issues were rare, with only eight incidents reported during the years 2012-15. Thereafter, however, Defendants reported at least nine plant closures or production limitations that resulted in reduced supply of MDI and TDI in 2016, at least 15 plant closures or production limitations in 2017, and at least eight plant closures or production limitations thus far in 2018. This sudden incidence of plant closures and production limitations among all major manufacturers and sellers of MDI and TDI products is unprecedented and cannot be explained by mere coincidence. Rather, it is the result of an illegal agreement among the Defendants.

5.     Defendants' collective restraint of MDI and TDI supplies worldwide caused a global shortage, which led to a series of price hikes for MDI and TDI products sold in the United States and elsewhere that commenced in 2016 and that continue to the present. As a result of Defendants' conspiracy, TDI and MDI prices have reached unprecedented high levels. Defendants' conspiracy has resulted in a minimum millions of dollars in overcharges for MDI and TDI purchasers during the proposed Class Period.

## JURISDICTION AND VENUE

6.     This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees for the injuries sustained by Plaintiff and

members of the Class resulting from Defendants' successful efforts to restrain trade in the United States. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

7.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of their activity that affected the interstate trade and commerce discussed below has been carried out in this District.

8.     During the Class Period, Defendants sold MDI and TDI in a continuous and uninterrupted flow of interstate commerce, including in this District. Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

9.     This Court has *in personam* jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; (b) participated in selling MDI throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an anti-competitive and otherwise illegal conduct that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

10.     By reason of the unlawful conduct alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class. Defendants, directly and through their agents, engaged in activities affecting all states, to restrict output and fix, raise, maintain and/or stabilize prices in the United States for MDI and TDI, which unreasonably restrained trade and adversely affected the markets for MDI and TDI.

11.     Defendants' unlawful conduct described herein adversely affected persons and entities in the United States who purchased MDI, including Plaintiff and the members of the Class.

## PARTIES

12.     Plaintiff Emma Chemicals Co., Inc. ("Emma Chemicals") is a Connecticut corporation with its principal place of business in Riverside, Connecticut. Emma Chemicals purchased MDI and/or TDI from one or more Defendants during the Class Period and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

13.     Defendant BASF SE is a German corporation with its principal place of business in Ludwigshafen, Germany. BASF SE has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, BASF SE manufactured and/or sold MDI and/or TDI products to purchasers in the United States, directly or through predecessors, affiliates and/or subsidiaries.

14.     Defendant BASF Corporation ("BASF Corp.") is a Delaware corporation with its principal place of business in Florham Park, New Jersey. During the Class Period, BASF Corp. manufactured and/or sold MDI and/or TDI products to purchasers throughout the United States. BASF Corp. is the North American affiliate of BASF SE. BASF SE controls

BASF Corp. both generally and with respect to the conduct of BASF Corp. in furtherance of the unlawful acts alleged in this Complaint. BASF SE and BASF Corp. are collectively referred to as BASF.

15.     Defendant Bayer AG is a German corporation with its principal place of business in Leverkusen, Germany. Bayer AG has extensive operations in the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Bayer AG manufactured and/or sold MDI and/or TDI products to purchasers throughout the United States either directly or through its wholly-owned subsidiaries Bayer MaterialScience LLC (currently d/b/a Covestro LLC) and Bayer Corporation.

16.     Defendant Bayer Corporation ("Bayer Corp.") is an Indiana corporation with its principal place of business in Pittsburgh, Pennsylvania. It is a wholly-owned subsidiary of Bayer AG During the Class Period, Bayer Corp. manufactured and/or sold MDI and/or TDI products to purchasers throughout the United States. Bayer AG controls Bayer Corp. both generally and with respect to the conduct of Bayer Corp. in furtherance of the unlawful acts alleged in the Complaint.

17.     Defendant Bayer MaterialScience LLC ("Bayer MaterialScience") formerly known as Bayer Polymers, LLC, is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. It is a wholly-owned subsidiary of Bayer AG. During the Class Period Bayer MaterialScience manufactured and sold polyurethanes, MDI, and TDI in the United States and elsewhere. In 2015 Defendant Bayer MaterialScience separated from its parent company to form Defendant Covestro AG. *See infra*. Bayer AG, Bayer Corp. and Bayer MaterialScience are collectively referred to as "Bayer".

18.     Defendant Covestro LLC is a Delaware company with its principal place of business in Pittsburgh, Pennsylvania. On September 1, 2015, Covestro LLC was created as a spin-off from Bayer MaterialScience. As of February of 2017, Bayer AG still held 64% of Covestro LLC. By September of 2017, Bayer AG's ownership stake in Covestro LLC had declined to below 25%; it sold its remaining interest by May of 2018 (excluding Bayer's pension fund, which owned about 9% of Covestro LLC's shares). During the Class Period, Covestro LLC manufactured and/or sold MDI and/or TDI products to purchasers throughout the United States. Up until around September of 2017, Bayer controlled Covestro LLC both generally and with respect to the conduct of Covestro LLC in furtherance of the unlawful acts alleged in this Complaint.

19.     Defendant Dow Chemical Company ("Dow") is a Delaware corporation with its principal place of business in Midland, Michigan. During the Class Period, Dow manufactured and/or sold MDI and/or TDI products to purchasers throughout the United States. On December 11, 2015, Dow and E.I. du Pont de Nemours and Company ("DuPont") entered into an agreement and plan of merger, under which the companies became subsidiaries of DowDuPont Inc. ("DowDuPont"), a holding company.

20.     Defendant Huntsman International LLC ("Huntsman International") is a Delaware company with its principal place of business in Woodlands, Texas. During the Class Period, Huntsman International manufactured and/or sold MDI products to purchasers throughout the United States. Huntsman International is a wholly owned subsidiary of Huntsman Corporation.

21.     Defendant Huntsman Corporation ("Huntsman Corp.") (formerly Huntsman LLC) is a Delaware corporation with its principal place of business in Salt Lake City, Utah.

During the Class Period, Huntsman Corp. manufactured and/or sold MDI products to purchasers throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. Huntsman Corp. controls Huntsman International generally and with respect to the conduct of Huntsman International in furtherance of the unlawful acts alleged in this Complaint. Huntsman Corp. and Huntsman International are collectively referred to as "Huntsman".

22.     Mitsui Chemicals America, Inc. ("Mitsui America") is a Delaware corporation with its principal place of business in Rye Brook, New York. During the Class Period, Mitsui America manufactured and/or sold MDI and TDI products to purchasers throughout the United States. Mitsui America is a wholly owned subsidiary of Mitsui Chemicals, Inc.

23.     Mitsui Chemicals, Inc. ("Mitsui Japan") is a Japanese corporation with its principal place of business in Tokyo, Japan. Mitsui Japan has extensive operations throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Mitsui Japan manufactured and/or sold MDI and TDI products to purchasers in the United States, directly or through predecessors, affiliates and/or subsidiaries.

24.     Mitsui Chemicals & SKC Polyurethanes, Inc. ("MCNS") is a Korean and Japanese corporation with its principal place of business in Seoul, Korea. MCNS was established in July 1, 2015 as an equally-owned joint venture between Mitsui Japan and South Korea-based SKC Polyurethanes Inc. MCNS has operations throughout the United States, its territories, and the District of Columbia, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, MCNS manufactured and/or sold MDI and TDI products to purchasers in the United States, directly or through predecessors, affiliates, and/or subsidiaries

25.      MCNS Polyurethanes USA Inc. ("MCNS USA") is a Georgia corporation with its principal place of business in Covington, Georgia. During the Class Period, MCNS USA manufactured and/or sold MDI and TDI products to purchasers in the United States. MCNS USA is a wholly owned subsidiary of MCNS. Mitsui Japan controls Mitsui America, MCNS and MCNS USA both generally and with respect to the conduct of Mitsui America, MCNS and MCNS USA in furtherance of the unlawful acts alleged in this Complaint. Mitsui Japan, Mitsui America, MCNS USA, and MCNS ar collectively referred to as "Mitsui".

26.      Wanhua Chemical (America) Co. Ltd. ("Wanhua America") is a Nevada corporation with its principal place of business in Newtown Square, Pennsylvania. During the Class Period, Wanhua America manufactured and/or sold MDI and TDI products to purchasers throughout the United States. Wanhua America is a wholly owned subsidiary of Wanhua Chemical Group Co., Ltd.

27.      Wanhua Chemical Group Co., Ltd. ("Wanhua China") is a Chinese corporation with its principal place of business in Yantai, China. Wanhua China has extensive operations throughout the United States, its territories, and the District of Columbia, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Wanhua China manufactured and/or sold MDI and TDI products to purchasers throughout the United States, directly or through predecessors, affiliates and/or subsidiaries. Wanhua China controls Wanhua America both generally and with respect to the conduct of Wanhua America in furtherance of the unlawful acts alleged in this Complaint. Wanhua China and Wanhua America are collectively referred to as "Wanhua".

28.     When Plaintiff refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all Defendant companies within that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached by them. Furthermore, to the extent that subsidiaries within corporate families distributed products containing MDI and/or TDI, these subsidiaries played a significant role in the alleged conspiracy because Defendants sought to ensure that the prices of such products would not undercut the pricing agreements reached at these various meetings. Thus, all Defendant entities within the corporate families were active, knowing participants in Defendants' conspiracy.

## CLASS ALLEGATIONS

29.     Plaintiff brings this action on behalf of himself and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as representative of a class (the "Class") defined as follows:

> All entities in the United States and/or its territories who
> directly purchased (including through controlled subsidiaries,
> agents, affiliates and/or joint ventures) Methylene Diphenyl
> Diisocyanate Products and/or Toluene Diisocyanate Products
> from any of the Defendants or their subsidiaries or affiliates,
> at any time from at least January 1, 2016 until the present.

30.     Excluded from the Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal

representative, heir, or assign of any Defendant and any person acting on their behalf. Also excluded from the Class are any judicial officers presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

31.     The Class Members are so numerous and geographically dispersed that joinder of all members is impracticable.

32.     The Class Members are readily ascertainable and are ones for which records should exist, including, specifically Defendants' records and transaction data.

33.     Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and other Class Members have all sustained damage in that, during the Class Period, they purchased MDI and/or TDI at artificially maintained, non-competitive prices, established by Defendants' actions in connection with the violations alleged herein.

34.     Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has purchased MDI and/or TDI directly from one or more Defendants. Plaintiff has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of other Class Members.

35.     Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members. The common legal and factual questions, which do not vary among Class Members include, but are not limited to, the following:

    a.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of MDI and TDI products sold in the United States and/or its territories;

b.   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate customers and the markets for MDI and TDI products sold in the United States;

c.   The identity of the participants of the conspiracy; the duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.   Whether the conspiracy violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

e.   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and other members of the Class;

f.   The effect of the conspiracy on the prices of MDI and TDI products sold in the United States and its territories during the Class Period; and

g.   The appropriate class-wide measure of damages.

36.   A class action is superior to any other method for the fair and efficient adjudication of these issues, as joinder of all members is impracticable. The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## FACTUAL BACKGROUND

**A.     MDI and TDI**

37.     Polyurethanes were first produced in 1937 by Otto Bayer and represent a group of polymers rather than a single polymer. This group is sometime referred to as urethane polymers.[1]

38.     The main usages for polyurethanes are in the furniture and mattress industry, automotive industry, building/construction industry, and refrigeration industry.[2]

39.     The principle raw materials for polyurethanes are diisocyanates.

40.     Diisocyanates are reactive intermediates characterized by terminal isocyanate groups, which typically are reacted with the hydroxyl groups of polyol coreactants to form polyurethanes.

41.     The most widely used diisocyanates and polyisocyanates are aromatic in their composition. The two most common diisocyanates are Methylene Diphenyl Diisocyanate ("MDI") and Toluene Diisocyanate ("TDI").

42.     Due to their reactivity and the diversity of their uses, MDI and TDI are generally supplied by the manufacturers as raw materials and sold to companies like Plaintiff who then combine them with other chemicals to create various polyurethanes with a wide diversity of applications.[3]

43.     MDI and TDI are the largest-volume aromatic diisocyanates, are high production volume chemicals, and are predominantly used in the production of polyurethanes. In 2008, the

---

[1] *Eco-profiles of the European Plastics Industry: Diphenylmethane diisocyanate,* Plastics Europe (March 2005).

[2] *Id.*

[3] https://www.epa.gov/sites/production/files/2015-09/documents/mdi.pdf

U.S. demand for pure MDI was 192.1 million pounds and for polymeric MDI was 1,418 million pounds (ACC, 2009).[4]



Figure 4
Schematic diagram showing the principal operations leading to the production of MDI.
* Note that hydrogen can be produced by a variety of different methods; e.g. from the electrolysis of sodium chloride, as a by-product in hydrocarbon cracking, etc.

[4] https://www.epa.gov/sites/production/files/2015-09/documents/mdi.pdf

44.     The production of polyurethanes, MDI, and TDI is a costly and highly technical process. The chart below represents just one of the ways in which TDI and MDI can be produced.



Figure 5
Schematic diagram showing the principal operations leading to the production of TDI.
* Note that hydrogen can be produced by a variety of processes; e.g. during the electrolysis of sodium hydroxide, as a by-product in hydrocarbon cracking, etc.

45.     The cost is further increased due to the hazards of handling the material needed for the manufacturing process.

46.     Both the technologies and the large capital costs associated with production create large barriers to entry.

47.     Polyurethanes, MDI, and TDI are each undifferentiated commodity products.

48.     Due to their unique characteristics polyurethanes, MDI, and TDI do not have any close substitutes.

**B.     MDI and TDI Markets**

49.     Due in part to these large barriers to entry the market for TDI and MDI is highly concentrated.

50.     During the Class Period, the largest manufacturers and sellers of MDIs were Defendants Wanhua, BASF, Covestro, Huntsman, Dow and Mitsui. MDI market shares in 2016 were as follows: Wanhua (28%, including shares of subsidiary BorsodChem); BASF (21%); Covestro (19%); Huntsman (13%); Dow (9%); and Mitsui (less than 10%), which amounts to over 90 percent of the global MDI market.

51.     During the Class Period, the largest manufacturers and sellers of TDIs were Defendants BASF, Covestro, Wanhua, Mitsui, and Dow. TDI market shares in 2016 were as follows: BASF (30%); Covestro (25%); Wanhua (13%, including shares of subsidiary BorsodChem); Mitsui (8%); and Dow (less than 8%), which amounts to over 76% of the global TDI market. MDIs and TDIs are highly profitable, which is why they make up a large segment of the Defendants' overall business. For example, Covestro reported in its 2016 Annual Report that 6.1 billion euros, or 50% of Covestro's sales, were attributed to its Polyurethane segment consisting of MDIs, TDIs and polyols. Similarly, in its 2016

Annual Report, Huntsman stated that "[i]n 2016, our TDI EBITDA increased by 9%." In February of 2017, BASF reported that its operating profit was six billion euros and polyurethane was responsible for 9% of BASF's total sales of 70 billion euros, with TDI alone accounting for an estimated 5%.

52.     The global MDI industry has doubled in size during the last decade or so. The industry produced 3.3 million metric tons in 2005, 4.4 million metric tons in 2010, and then ballooned to 6.4 million metric tons in 2016. Much of this growth was driven by global trends in the energy management, food preservation, demographics and transportation sectors.

53.     Covestro's 2015 Annual Report projected that demand for MDIs would increase from 5.710 kt in 2014 to 7.990 kt in 2020, a 5.8% increase in compound annual growth rate ("CAGR"). The report also projected that demand for TDIs would increase by a 4.8% CAGR during the same period.

54.     MDI and TDI supplies in the United States were stable in the years leading up to the conspiracy period. In September of 2014, ICIS observed that MDI prices in the United States were "steady, amid balanced supply and demand. No pricing announcements have been heard, suggesting prices will remain[] stable into October". Indeed, prices for MDI and TDI products remained relatively stable between 2012 and 2015.

55.     As of 2015, Defendants Bayer MaterialScience (aka Covestro) produced about 44% of the global supply of MDI and TDI.

56.     As of 2015 Defendant Bayer MaterialScience was responsible for 58% of the TDI produced in the United States, and 21% of the MDI produced in the United States.

57.     As of 2015 Defendant BASF produced about 17% of the global supply of MDI and TDI. As of 2015 Defendant BASF was responsible for 42% of the TDI produced in the United States, and 20% of the MDI produced in the United States.[5]

58.     At all relevant times, Defendants had substantial market power with respect to MDI and/or TDI products. During the Class Period, Defendants exercised this power to maintain supracompetitive prices for MDI and TDI products without losing so many sales as to make the elevated prices unprofitable.

**C.     Defendants Created Artificial Shortages of MDI and TDI Products.**

59.     Defendants agreed to artificially reduce overall supply in the global market of MDI and TDI and then to coordinate with each other to raise prices in lockstep fashion.

60.     By 2014, Defendants saw limited profits in MDI and TDI products due to an overabundance in the market that kept prices low. In 2015, Covestro explained in its Annual Report that TDI prices decreased in 2014 partly due to "increased competition owing to higher product availability."

61.     As demonstrated in the following graph generated by Covestro, as of 2014, an *increase* in core volume growth led to a *decrease* in its Adjusted EBITDA (income with interest, taxes, depreciation and amortization added back in) margin whereas a *decrease* in its volume growth in 2015 generated an *increase* in the company's adjusted EBITDA margin.

---

[5] The remaining 59% of USA MDI production is divided between the Dow Chemical Company and Huntsman International LLC.



62.    MDI and TDI utilization rates (measure of the proportion of potential economic output that is truly realized) were consistent with this global trend. For example, the chart below, which was created by Covestro in 2016, shows MDI industry utilization rates that were largely in the low 80% range. The utilization rate reached its peak around 2013 and 2014 before dipping slightly back down to the low 80% level in 2015.



63.     Noticeable in Covestro's own data is that the MDI utilization rate should continue to decline into 2017, despite a prediction that the industry demand would be rising quickly through 2020.

64.     Attempting to take advantage of growing global demand for MDI and TDI products in 2016, Defendants aggressively decreased their utilization capacity rates by cutting down their production output, a practice that sharply contrasted with their previous conduct.

65.     In the pre-conspiracy period (2012-15), there were a total of eight MDI or TDI plant production-related issues—one in 2012, three in 2013, none in 2014, and four in 2015—amounting to an average of two production issues per year. Noticeability since the start of the conspiracy, there have been a total of at least 32 plant production-related issues, at least 9 in 2016 and at least 15 reported incidents in 2017. Defendants attributed these incidents to plant closures, *force majeures*, suspended productions, and plant operation at reduced capacity. As reported in *Rubber News* on June 21, 2017, this sudden restriction of supply led to increases in prices which were "completely unprecedented in amplitude and speed."

66.     As noted by Jon Cheele, managing director of Vita Cellular Foams, "[w]e've never seen anything like this duration. We've seen these quantum of increases, but we've never seen these absolute prices before. We have found six-month spikes, six-month drops but nothing goes over a year."[6]

67.     Many of the plant closures or supply reduction announcements appear inconsistent with the Defendants' business practices. For example, BASF spent a billion euros and prepared for years to plan, obtain permits, design, and construct the TDI plant (the "Ludwigshafen Plant")

---

[6] http://www.rubbernews.com/article/20170621/NEWS/170629982/high-diisocyanate-prices-could-slow-polyurethane-growth; *see also*, www.recitcel.com/market-shortage-mdi-raw-materials-affects-operations-recticle-insulation.html ("unprecedented raw material price increases prevailing in the polyurethane industry due to a tightening supply of isocyanates.")(April 26, 2017).

in Rhineland Palatinate, Germany, which opened in November 2015. Since its opening however, the plant has barely progressed beyond a brief trial operation period, with alleged "technical problems" repeatedly causing delays and shutdowns. The plant went completely out of commission in November of 2016, following a report that there was a leak of phosgene gas.

68.     On February 15, 2017, BASF announced that although operations would begin again, its projected production output of 300,000 tons of TDI will not likely be attained until 2018— *nearly a year later*— attributing the delay to a defective phosgene reactor in the plant. Today, nearly a year and a half after that announcement, the Ludwigshafen Plant is still operating at reduced capacity. Industry reports indicate that issues at the Ludwigshafen Plant were "instrumental in maintaining supply tightness in the market and driving up pricing.".

69.     Similarly, in May of 2016, Mitsui permanently closed an MDI plant in Omuta, Japan. Given that it takes approximately seven years (and billions of dollars) to plan, obtain permits, design, construct and fully operate an MDI plant, Mitsui's decision to shut down its plant in the face of escalating demand of MDIs was not a rational business decision; it can best be explained as being part of an unlawful conspiracy.

70.     As another example, on August 30, 2017, Covestro declared a *force majeure* on its MDI and TDI plants located in Baytown and Channelview, Texas due to flooding caused by Tropical Storm Harvey. These Texas facilities can produce 340,000 tonnes/year of MDI and 220,000 tonnes/year of TDI. Covestro did not lift its *force majeures* until more than a month later for its MDI plants and until two months later for its TDI plants. This conduct is inherently suspicious since Huntsman confirmed on September 3, 2017 that "[a]ll Huntsman sites in the regions affected by Harvey weathered the storm safely, with no safety incidents to our associates…"

71.     The chart below reflects a sample of the reported incidents of MDI/TDI plant closures, *force majeures* ("FM"), suspensions of production and reports of operation at reduced rates during the conspiracy period:

| Date | Defendants | Action |
|------|-----------|--------|
| March 2016 | Mitsui | Suspend production of TDI |
| May 2016 | Mitsui | Terminate Omuta MDI plant in Japan |
| May 11, 2016 | Covestro | FM in USA TDI Production |
| July 2016 | Mitsui | Suspend production of TDI at Omuta plant |
| October 6, 2016 | Covestro | Declare FM in MDI production plants in Europe. |
| November 2016 | BASF | Suspend TDI production in Ludwigshafn |
| November 2016 | Mitsui | Run Yeosu plant at below 50% MDI production. |
| Nov/Dec 2016 | Huntsman | Limit MDI production from Rozenburg plant. |
| February 2017 | Mitsui | Reduce MDI output in Yeosu plant |
| April 25 2017 | Covestro | Declare FM in MDI plant, Brunsbuttel, Germany. |
| April 2017 | Wanhua | MDI production issues. |
| May 2017 | Huntsman | Technical issues in MDI production in Rotterdam. |
| May 26, 2017 | BASF | Declare FM in MDI plant Geismar, La. |
| August 14, 2017 | Wanhua | Declare FM in MDI plant, Kazincbarcika, Hungry. |
| August 30, 2017 | Covestro | Declare FM in MID plants, Baytown & Channelview, Tx |
| August 31, 2017 | Dow | Declare FM in MID plant, Freeport, Tx. |
| September 8, 2017 | Mitsui | Reduce output of MDI in Yeosu. |

| October 5, 2017 | BASF | Recall TDI from Ludwigshafen plant. |
| December 2017 | Wanhua | Suspended MDI production in Ningbo |
| December 12, 2017 | BASF | Declare FM of MDI in Chongqing. |
| January 2018 | BASF | Close TDI plant in Ludwigshafen |
| January 24, 2018 | DOW | Declare FM on MDI plant in Freeport, Tx |
| January 25, 2018 | BASF | Declare FM on MDI plant in Houston, Tx |
| January 31, 2018 | BASF | Declare FM on TDI plant in Geismar, LA |
| March 24, 2018 | Huntsman | Reduce MDI output in Rozenburg plant. |

72.     Moreover, "plant production problems" that occurred in various parts of the world had a *global* impact on the supply, and therefore the price, of MDI and TDI products sold all over the world, including in the United States. ICIS in February of 2018 noted, "US prices for toluene di-isocyanate (TDI) were assessed 9 cents/lb. ($198/tonne) higher on Wednesday, owing to ongoing ***global supply woes***", explaining that production issues in the United States were exacerbated by production issues in Europe and South Korea that resulted in renewed supply tightness in global markets. (emphasis added).

> ### D.     Defendants Take Advantage of Their Conspiratorial Shortage to Engage in Anomalous Lockstep Price Increases Which Have Resulted in Record High TDI and MDI Prices.

73.     Defendants' collusive reductions enabled them to impose a series of lockstep price increases for MDI and TDI products that have remained in place for an unprecedented period of at least two-and-a-half years and counting. According to a January 2018 report by ICIS, the persistent supply shortages and growing demand is leaving "isocyanate buyers …[with] little

alternative but to accept consecutive rounds of price increases, with some sellers heard to have taken a 'take it or leave it' attitude towards their price increase initiatives, which would normally be at least partially negotiable."

74.    During a conference call with financial analysts on February 23, 2018, Huntsman CEO Peter Huntsman stated that he expected MDI prices to drop in the coming months, unless something unforeseen happens. This statement proved to have been at best erroneous, however, as MDI and TDI prices have continued to rise into mid-2018.

75.    On February 27, 2018, Hans-Ulrich Engel, the Vice-Chairman of the Board of Executive Directors and CFO at BASF, stated in an investors' call that "significantly higher prices, especially for MDI and TDI, drove this [sales] growth," explaining that the cause of the increased prices was "due in part to turnarounds and the *force majeure* at our Chongqing plant caused by a natural-gas supply-shortage at our syngas supplier." In that same call, former BASF CEO Kurt Bock confirmed that the temporary shutdown of the Chongqing plant "certainly ha[s] some double-digit EBIT impact." He further commented that supplier issues on the U.S. Gulf Coast has also impaired production volumes, which he described as "again a double-digit impact."

76.    Indeed, prices of MDI and TDI products commenced an upward trajectory in 2016 that is ongoing and is in stark contrast to pre-conspiracy prices in 2013-15. The charts below compare and depict the stark contrast between pre-conspiracy and conspiracy MDI and TDI pricing trends between those two respective periods

**PRICING KNOWN PRE-CONSPIRACY**



**PRICING POST KNOW CONPSPIRACY**



77.     Below is a chart showing the price increase and effective dates is contained in

of MDI price increase announcements between 2015 and 2018, primarily by Defendants

Dow, Wanhua, BASF[7]:

| Date | Defendant | Increase (cents/lb.) |
|---|---|---|
| March 17, 2016 | Dow | 5 |
| March 23, 2016 | BASF | 8 |
| March 30, 2016 | Wanhua | 6 |
| April 1, 2016 | Dow | 5 |
| April 1, 2016 | BASF | 6 |
| May 15, 2016 | Wanhua | 4 |
| September 15, 2016 | Dow | 6 |
| September 15, 2016 | Wanhua | 6 |
| January 1, 2017 | Dow | 7 |
| January 15, 2017 | Wanhua | 8 |
| January 16, 2017 | BASF | 7 |
| February 12, 2017 | BASF | 10 |
| February 15, 2017 | Dow | 6 |
| February 17, 2017 | Covestro | (15% increase) |
| March 1, 2017 | Wanhua | 8 |
| March 15, 2017 | Dow | 10 |
| April 1, 2017 | BASF | 8 |
| April 3, 2017 | Dow | 10 |
| May 15, 2017 | Dow | 12 |

[7] Huntsman has not released information on regarding prices increases during the last few years (except for the one from July 1, 2018 noted in the chart), but its earnings reports for 2016, 2017 and 2018, as well as its Annual Report for 2017 indicate that it increased prices on MDI sold in the United States and earned increased revenues as a result. Both in timing and amount, these price increases matched what the rest of the industry did. The same applies to Defendants Covestro, Bayer and Mitsui with respect to both the MDI price increase chart and the TDI price increase chart shown further below. As for the TDI chart, Huntsman ceased marketing TDIs in 2005, when it sold that business to BASF.

| Date | Defendant | Increase (cents/lb.) |
|---|---|---|
| May 15, 2017 | BASF | 13 |
| May 15, 2017 | Wanhua | 12 |
| August 15, 2017 | Dow | 8 |
| September 15, 2017 | Wanhua | 10 |
| October 15, 2017 | Dow | 8 |
| October 15, 2017 | BASF | 8 |
| January 1, 2018 | Dow | 9 |
| January 1, 2018 | BASF | 8 |
| March 15, 2018 | Dow | 15 |
| April 1, 2018 | BASF | 10 |
| July 1, 2018 | Huntsman | 12 |

78.     Below is a chart showing the price increase and effective dates is contained in

of TDI price increase announcements between 2015 and 2018, primarily by Defendants

Dow, Wanhua, BASF:

| Date | Defendant | Increase (cents/lb.) |
|---|---|---|
| March 17, 2016 | Dow | 5 |
| March 23, 2016 | BASF | 8 |
| March 30, 2016 | Wanhua | 6 |
| April 1, 2016 | BASF | 8 |
| April 15, 2016 | Dow | 5 |
| May 13, 2016 | BASF | 8 |
| May 15, 2016 | Wanhua | 4 |
| May 17, 2016 | Dow | 8 |
| June 15, 2016 | Wanhua | 5 |
| July 8, 2016 | Dow | 5 |

| Date | Defendant | Increase (cents/lb.) |
|---|---|---|
| July 21, 2016 | BASF | 5 |
| October 7, 2016 | BASF | 10 |
| October 11, 2016 | Dow | 10 |
| October 13, 2016 | Wanhua | 10 |
| December 15, 2016 | Dow | 10 |
| February 1, 2017 | BASF | 10 |
| February 15, 2017 | Wanhua | 10 |
| March 21, 2017 | Dow | 10 |
| April 1, 2017 | BASF | 8 |
| May 1, 2017 | BASF | 10 |
| May 15, 2017 | Wanhua | 10 |
| August 15, 2017 | Dow | 8 |
| August 15, 2017 | Wanhua | 8 |
| August 20, 2017 | BASF | 8 |
| October 1, 2017 | Dow | 12 |
| October 1, 2017 | BASF | 12 |
| December 1, 2017 | Wanhua | 10 |
| February 1, 2018 | BASF | 10 |
| February 1, 2108 | Wanhua | 10 |
| March 1, 2018 | Dow | 15 |
| March 1, 2018 | Wanhua | 10 |
| April 1, 2018 | BASF | 10 |

79.     As shown above, Defendants implemented their MDI and TDI price increases in close proximity, ranging largely from a few weeks to announcements made on the same day. The amounts of Defendants' price increases were either identical or nearly identical.

80.     Neither changes in demand nor changes in the price of raw material needed to create MDI or TDI explain the increased prices.

81.     Defendants' unlawful price-fixing conspiracy resulted in enormous profits to Defendants from the supracompetitive prices of MDI and TDI products they sold.

82.     In 2016, Huntsman claimed in its Annual Report that "[w]e strengthened our balance sheet by repaying $560 million debt" and "our MDI EBITDA increased by 9%" in 2016.

83.     In its 2017 Annual Report, Huntsman remarked that "the increase in revenues in our polyurethanes segment for 2017 compared to 2016 was primarily due to higher average selling prices...the increase in segment adjusted EBITDA was primarily due to higher MDI margins…" Huntsman further commented during its quarterly earnings call that:

> The increase in revenues in our polyurethanes division for the three months ended December 31, 2016 compared to the same period in 2015 was primarily due to higher MDI average selling prices and higher MDI sales volumes. MDI average selling prices increased sharply in Asia primarily as a result of a competitor's outage. MDI sales volumes increased primarily due to higher demand in the Americas region. The decrease in adjusted EBITDA was primarily due to lower MTBE margins, partially offset by higher MDI margins and sales volumes.

84.     In February of 2017, BASF reported that its operating profit was six billion euros and polyurethane was responsible for nine percent of BASF's total sales of 70 billion euros, with TDI alone accounting for an estimated five percent.

85.     Covestro's 2017 Annual Report also reveals that sales in the polyurethanes segment were up 29.2% year over year to 7,660 million euros (compared to 5,927 million euros in the previous year) "[t]hanks to an altogether advantageous supply/demand situation, higher selling prices in polyurethanes resulted in sales growth of 26.9%."

86. Dow trumpeted in a 1Q 2018 earnings call that "polyurethanes and CAV benefited from strong demand and price increases in downstream systems applications as well as from tight MDI fundamentals."

**E.    Defendants Take Advantage of Trade Association and Industry Meetings to Discuss Their Planned Conspiracy.**

87. Defendants have ample opportunities to meet and collude with one another by participating in various conferences, trade associations, seminars, workshops, dinners and meetings. For example, Defendants BASF, Covestro, Dow, Huntsman and Wanhua (through its subsidiary BorsodChem) were five of the six members of ISOPA, a European trade association for producers of diisocyanates.

88. At all relevant times Defendants BASF, Covestro, Huntsman, and Wanhua have been members of the Polyisocyanurate Insulation Manufacturers Association ("PIMA"), a national trade association representing polyiso insulation manufacturers and suppliers to the polyiso industry. PIMA holds numerous events each year, including a one-week mid-year and annual meeting for its members. Representatives of BASF, Covestro, Dow, Bayer, Huntsman, Wanhua and Mitsui had the opportunity to meet and conspire before, during and after such PIMA events to conspire to fix, raise, maintain and stabilize prices of MDI and TDI products sold in the United States and elsewhere.

89. At all relevant times, Defendants Covestro LLC, Bayer, BASF, Dow, Huntsman, Wanhua and Mitsui were members of the American Chemistry Council ("ACC"), whose mission is to "deliver value to our members through advocacy, using best-in-class member engagement, political advocacy, communications and scientific research." Every year, ACC holds several events, including seminars, workshops, conferences, trade shows and dinners. Representatives of BASF, Covestro, Dow, Bayer, Huntsman, Wanhua and Mitsui had the opportunity to meet and

conspire before, during and after such ACC events and conspired to fix, raise, maintain and stabilize prices of MDI and TDI products sold in the United States.

90.     At all relevant times, Defendants Covestro LLC, BASF, Bayer, Dow, Huntsman, Wanhua and Mitsui were members of the International Isocyanate Institute. Representatives of BASF, Covestro LLC, Bayer, Dow, Huntsman, Wanhua and Mitsui had the opportunity to meet and conspire before, during and after their meetings related to the International Isocyanate Institute and conspire to fix, raise, maintain and stabilize prices of MDI and TDI products sold in the United States.

91.     At all relevant times, at least Defendants Covestro LLC, BASF and Huntsman were members of the Polyurethane Manufacturers Association ("PMA"), whose purpose is, among other things, "[t]o exchange and disseminate information among its members as to improvements, standards, processing of raw materials, and advancements in the economics relative to the polyurethane elastomer industry." Representatives of BASF, Covestro LLC, and Huntsman had the opportunity to meet and conspire before, during and after their meetings related to the PMA and conspired to fix, raise, maintain and stabilize prices of MDI and TDI products sold in the United States.

92.     At all relevant times, Defendants BASF, Covestro, Dow, Huntsman and Wanhua were the sole members of the Diisocyanates Panel ("DII Panel"). The DII Panel "sponsors research on MDIs and TDIs, monitors impending regulations, legislation, and other initiatives affecting the production or use of diisocyanates, and develops appropriate responses." Representatives of BASF, Covestro, Dow, Huntsman, and Wanhua had the opportunity to meet and conspire before, during and after their meetings related to the DII Panel and conspire to fix, raise, maintain and stabilize prices of MDI and TDI products sold in the United States.

93.     At all relevant times, Defendants BASF, Bayer, Covestro LLC, Dow, Huntsman,

Wanhua and Mitsui were members of and have participated in the business of the Center for the

Polyurethanes Industry ("CPI") of the American Chemistry Council. Its purpose is "to promote

growth of the North American polyurethanes industry through effective advocacy, delivery of

compelling benefits messages demonstrating how polyurethanes deliver sustainable outcomes,

and creation of robust safety education and product stewardship programs."

94.     Every year, CPI holds an annual conference called the Polyurethanes Technical

Conference, which is the longest-running polyurethanes conference in North America and touts

itself as the "industry's premiere polyurethane business and networking event." As described by

a conference attendee Paul Duffy during the 2014 Polyurethanes Technical Conference, "this

conference is the premiere event for polyurethane professionals to exchange information,

brainstorm, recognize threats and so on."

95.     The 2016 Polyurethanes Technical Conference took place at the Hilton Baltimore in

Baltimore, Maryland from September 26-28, 2016 with pre-conference activities starting on

September 25, 2016. Among notable attendees were Richard Skorpenske of Covestro, Walter

White of BASF (Conference Committee Chairman and Technical Manager at BASF), Tom Feige

of Dow (Chair of CPI Steering Committee and Global Strategy Director for the Polyurethanes

Business Unit at Dow), and Paul Mackey (Business Development Director at Huntsman

Polyurethanes). During an interview at the 2016 Conference, Walter White of Defendant BASF,

stated:

> The Conference really provides some world-class networking opportunities.
> I think the opportunity people most think of is the industry reception which
> will take place tonight, and it's a place where people can get together and
> reconnect with old friends and maybe make some new friends and really talk
> with industry professionals. There are some other networking opportunities
> that are probably a little bit less well known or a little bit less recognized.

> Those would be the meeting spaces outside of the presentations where
> between papers, folks can get together and talk and get to know each other.
> And then there are also networking opportunities as the suppliers and
> attendees of the show plan events and we can really get together and have
> little bit more informal discussions and get together and meet each other.

Representatives of BASF, Covestro LLC, Bayer, Dow, Huntsman, Wanhua and Mitsui had the

opportunity to meet and conspire to fix, raise, maintain and stabilize prices of MDI and TDI

products before, during and after their meetings, seminars, programs, workshops and other

events offered at the 2016 Polyurethanes Technical Conference.

96.     As demonstrated above in the pricing charts, just weeks after the conference,

Defendants BASF, Dow and Wanhua all announced price increases for their TDI products.

97.     The 2017 Polyurethanes Technical Conference took place at the New Orleans

Marriott in New Orleans, Louisiana from October 2-4, 2017. Representatives of BASF, Covestro

LLC, Bayer, Dow, Huntsman, Wanhua and Mitsui had the opportunity to meet and conspire to

fix, raise, maintain and stabilize prices of MDI and TDI products before, during and after their

meetings, seminars, programs, workshops and other events offered at the 2017 Polyurethanes

Technical Conference.

**F.      Investigations and Complaints**

98.     In February of 2018 the Department of Justice served subpoenas to several companies

in furtherance of an investigation into price-fixing of MDI.

99.     The timing of the subpoena coincides with a coordinated price increase

announcement by Defendants. For Defendant Covestro, the announcement was for a dramatic

15% price increase.[8]

---

[8] https://everchem.com/covestro-raise-aliphatic-isocyanate-prices/; *see also*
https://www.basf.com/en/company/news-and-media/news-releases/2017/02/p-17-134.html

100.    This price increase is not supported by any mainstream economic theory. One would

expect that, as the costs for producing both MDI and TDI have steadily been decreasing during

the Class Period, there would be decreases in prices. However, announcements like those above

and recent pricing statistics reflect steady price increases or flat prices during the Class Period.

This pricing anomaly is due to Defendants' conspiracy.

101.    On June 8, 2018 Defendants BASF acknowledge its receipt of one of the above-

referenced subpoenas and released the following statement: "The U.S. Department of Justice has

issued a subpoena to BASF Corporation and several other companies related to an investigation

the government is initiating involving producers of MDI and alleged violations of antitrust law.

We will of course comply with the subpoena as requested by the DOJ; however, we are unaware

of any such violations."

102.    Also, on June 8, 2018 Covestro acknowledge it was a target of the DOJ's

investigation, and released the following statement. "Covestro has been contacted by the U.S.

Department of Justice regarding an investigation within the polyurethane industry. We will fully

cooperate with authorities throughout the investigation."

**G.      Defendants are Recidivist Antitrust Violators**

103.    In March of 2004, Crompton Corporation ("Crompton"), now known as Chemtura

Corporation, announced that it had entered into a plea agreement with the DOJ. It pled guilty to

criminal charges of fixing prices for rubber chemicals and paid a $50 million fine. *United States

v. Crompton*, No. CR 04-0079 MJJ (N.D. Cal.). Crompton thereafter received conditional

amnesty from the DOJ in connection with its investigation into price-fixing of urethane products.

104.    Due to Crompton's cooperation, the DOJ filed a criminal information against Bayer

on September 30, 2004, alleging participation in a price-fixing conspiracy with respect to

alphatic polyester polyols, compounds used in the making of polyurethane. *United States v. Bayer Corp.*, No. CR 04-0318 VRW (N.D. Cal.). On May 24, 2005, Bayer agreed to plead guilty to a criminal conspiracy to fix the prices of such polyester polyols from 1998 to 2002, and paid a $33 million fine.

105.    The guilty pleas were followed by the filing of various class actions which were consolidated in *In re Urethane Antitrust Litigation*, 2:04-md-01616 (D. Kan.). Plaintiffs in that proceeding charged BASF and the parent corporation of Bayer Material Science, among others, with conspiring to fix prices for polyether polyols, which (like MDI) are a key ingredient in polyurethanes. After BASF and Bayer settled the case for over $50 million each, the lone non-settling defendant settled for over $800 million after class plaintiffs prevailed at trial.

106.    In 2005, additional class cases were filed that alleged price-fixing conspiracy claims against Bayer, Chemtura, Dow, BASF and Lyondell for a price-fixing conspiracy as to MDI, TDI, and polyether polyols. After the JPML sent these cases to the district court in Kansas, the two sets of cases proceeded on distinct tracks except for discovery.

107.    In 2007, the European Court of First Instance ordered BASF to pay €35.02 million for participating in a cartel with other major European vitamin producers. BASF was among six companies found guilty in November 2001 of fixing vitamin prices between 1989 and 1999.

108.    In *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426 (E.D. Pa.), BASF paid $12 million to resolve allegations that it conspired to fix the prices of automotive refinishing paint between 1993 and 2000.

## ANTITRUST INJURY

109.    During the Class Period, Plaintiff and Class Members purchased MDI and TDI. As a result of Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for MDI

and TDI than they would have absent that conduct, and thus suffered substantial damages. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

110.    Because Defendants' unlawful conduct has successfully restrained competition in the market, Plaintiff and Class Members have sustained, and continue to sustain, significant losses in the form of artificial, non-competitive prices for MDI and TDI. The full amount of such damages will be calculated after discovery and upon proof at trial.

111.    No procompetitive justification or effects outweigh the anticompetitive effects of Defendants' conduct.

112.    Plaintiff and Class Members are suitable plaintiffs for pursuing antitrust violations by Defendants, insofar as they purchased MDI and TDI during the Class Period, and thus were harmed by Defendants' anticompetitive conduct.

113.    As a direct, intended, foreseeable, and proximate result of Defendants' unlawful conspiracy and acts in furtherance of their conspiracy, Plaintiff and Class Members have been injured in their business and property, in violation of federal antitrust laws. The injury to Plaintiff and Class Members is the type the antitrust laws were designed to prevent and directly flows from Defendants' unlawful anticompetitive conduct.

**DEFENDANTS FRAUDULENTLY CONCEALED THEIR MANIPULATION**

114.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their conspiracy. Through no fault or lack of diligence, Plaintiff and Class Members were deceived regarding Defendants' pricing of MDI and TDI and could not reasonably discover the conspiracy that resulted in that pricing.

115.     As alleged herein, Defendants' conduct was material to Plaintiff and Class members at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and Class members could not have discovered through the exercise of reasonable diligence that Defendants were artificially fixing, raising and/or maintaining the price of MDI.

116.     Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect Defendants' conduct until [publication of MLex report].

## TRADE AND INTERSTATE COMMERCE

117.     Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Defendants' knowing, active, and affirmative concealment. Thus, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

118.     During the Class Period, Defendants and their co-conspirators, manufactured, sold and/or shipped substantial quantities of MDI and TDI products, in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which the Defendants produced these products. In addition, the primary raw materials used to manufacture MDI and TDI products were purchased and shipped in a continuous and uninterrupted flow of interstate commerce.

119.     The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## FIRST COUNT
### Violation of 15 U.S.C. § 1

120.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth above.

121.    Defendants have conspired to fix prices in the relevant market in violation of Section 1 of the Sherman Act.

122.    As alleged above, Defendants entered into agreements with each other with the purpose and effect of unreasonably restraining trade and commerce in the relevant market.

123.    Defendants' conduct described above constitutes unlawful agreements, contracts, and concerted activity that unreasonably restrain trade in the relevant markets in violation of Section 1 of the Sherman Act.

124.    Defendants' conduct has no procompetitive benefit or justification. The anticompetitive effects of their conduct outweigh any purported procompetitive justifications.

125.    As a result of Defendants' conduct, and the harm to competition caused by that conduct, Plaintiff and Class Members have suffered substantial injuries to their business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

126.    Plaintiff and Class Members are also entitled to recover from Defendants the costs of suit, including reasonable attorneys' fees, as provided by 15 U.S.C. § 15.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class Members demand judgment as follows:

A.    Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel;

B.      That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1 *et seq.*;

C.      A judgment against Defendants for the damages sustained by Plaintiff and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

D.      By awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

E.      The costs of this suit, including reasonable attorney fees; and

F.      Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff, on behalf of himself and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

Dated: July 16, 2018                                Respectfully submitted,

                                           _____/s/ Linda P. Nussbaum_____
                                           Linda P. Nussbaum
                                           Bart D. Cohen
                                           Fred T. Isquith, Jr.
                                           NUSSBAUM LAW GROUP, P.C.
                                           1211 Avenue of the Americas, 40th Floor
                                           New York, NY 10036-8718
                                           (917) 438-9102
                                           lnussbaum@nussbaumpc.com
                                           bcohen@nussbaumpc.com
                                           fisquith@nussbaumpc.com

                                           *Counsel for Plaintiff Emma Chemicals Co., Inc.*
                                           *and the Proposed Class*